Docket No. 109014.

IN THE

SUPREME COURT

OF

THE STATE OF ILLINOIS

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
ITALO SANDERS, Appellant.

*Opinion filed October 7, 2010.*

JUSTICE GARMAN delivered the judgment of the court, with
opinion.

Chief Justice Fitzgerald and Justices Thomas, Kilbride, and
Karmeier concurred in the judgment and opinion.

Justice Freeman specially concurred, with opinion, joined by
Justice Burke.

**OPINION**

In 1994, defendant, Italo Sanders, was convicted in the circuit
court of Cook County of first degree murder and sentenced to 40
years in prison. The appellate court affirmed his conviction. *People v.
Sanders*, No. 1–94–1710 (1996) (unpublished order under Supreme
Court Rule 23). In November 2001, defendant filed a postconviction
petition, which the circuit court dismissed. After the appellate court
remanded for second-stage proceedings, the circuit court advanced
the petition to third-stage proceedings. Following oral argument, the
circuit court granted the State's motion to dismiss. The appellate
court affirmed. 393 Ill. App. 3d 152.

BACKGROUND

Defendant was charged with the murder of John Pinkerton, which occurred on January 24, 1992. Pinkerton was shot in a stairwell of the Robert Taylor Homes in Chicago, where he was walking with Alexander Robinson and seven-year-old Manuel Woods. Two months later, Pinkerton died from complications of his injuries. Prior to trial, defendant filed a motion *in limine* to preclude the State from introducing evidence related to street gangs. This evidence consisted of the testimony of Michael Stewart, who was Pinkerton's brother. At the hearing on defendant's motion, defense counsel told the court that two days after the shooting, Stewart saw defendant at the Robert Taylor Homes and asked defendant who had shot Pinkerton. Defendant allegedly replied that he could not tell Stewart, but that it was "BD business" and that Pinkerton had not been the intended target. Defendant asked Stewart if Pinkerton was dead and Stewart said no. Defendant smiled and walked away. The trial court denied defendant's motion, finding that the proposed evidence explained an otherwise inexplicable murder and that the probative value of the evidence outweighed any potential prejudice to defendant.

During jury selection, defense counsel submitted several questions to the trial court concerning possible gang contact or bias. The court refused to ask the questions, stating that an individual juror's opinion about gangs was not relevant and noting that the submitted questions were highly subjective and might serve to inflame the members of the venire.

At defendant's trial, then nine-year-old Manuel Woods testified that on January 24, 1992, he lived at the Robert Taylor Homes. His cousin, Michael Stewart, also lived there, on the same floor as Manuel. Around dinnertime, Pinkerton and Robinson came over to Manuel's apartment. They stayed for a while and then left. Manuel went with them. They were going to Stewart's apartment to watch a basketball game. They started walking down the hallway. Manuel was holding Pinkerton's hand. As they approached the elevator and stairway, Manuel heard gunshots. Pinkerton was "jumping." Manuel saw defendant at the top of the staircase. He was approximately 12 to 15 feet from Manuel. Defendant was holding a gun and shooting at Pinkerton, who pushed Manuel out of the way. Manuel ran to Stewart's apartment. Manuel stated that he went to the police station

with his mother and identified defendant in a lineup. He had previously seen defendant more than once at the Robert Taylor Homes.

On three occasions, the jury was shown a photograph of the stairwell at Robert Taylor Homes where the shooting took place. The photo showed gang graffiti on the walls of the stairwell which read, "GDs Die, Bds live."

Michael Stewart testified that a few days after the shooting, he saw defendant walking on the fifth floor of the Robert Taylor Homes. Stewart had seen defendant in the building several times, but did not know his name. Stewart told defendant that he had seen him in the stairwell the night Pinkerton was shot and he asked defendant who had shot Pinkerton. Defendant asked if Pinkerton was dead and, upon being told Pinkerton was alive, defendant said "it was BD business" and all he could tell Stewart was that Pinkerton was not the intended target. Stewart testified that the term "BD" meant Black Disciples, which was a street gang.

Sometime later, the police recovered a gun from defendant. A firearms expert testified that the bullets recovered from Pinkerton had the same class characteristics as the gun and could have been fired from the gun. However, the expert was unable to include or exclude the gun as the murder weapon.

Defendant called three witnesses to testify. His mother, sister, and girlfriend all testified that the three of them and defendant were in defendant's mother's apartment at the Robert Taylor Homes at the time of the shooting. They heard the shots and ran out to see what happened. Afterward, they went back into the mother's apartment and stayed there until defendant walked his girlfriend home about 10 p.m.

During closing arguments, the prosecutor referred to defendant's alleged gang affiliation and the alleged gang motive for the shooting by repeatedly referring to Stewart's testimony that defendant told him Pinkerton's shooting was "BD business." The jury convicted defendant and the trial court sentenced him to 40 years in prison.

On direct appeal, the appellate court affirmed defendant's conviction and sentence. Before the appellate court, defendant argued, *inter alia*, that the trial court had erred in refusing to ask potential jurors questions during *voir dire* concerning potential bias against gangs. The appellate court rejected this argument, concluding that the

trial court's questions were reasonably calculated to expose latent bias and prejudice. *Sanders*, No. 1–94–1710 (unpublished order under Supreme Court Rule 23).

On November 16, 2001, defendant filed a petition for postconviction relief, in which he alleged that the trial court erred in failing to *voir dire* potential jurors on the subject of gang bias. Defendant alleged that this failure, together with the State's reliance on gang-related evidence at trial, deprived him of his right to an impartial jury. In support, he cited this court's decision in *People v. Strain*, 194 Ill. 2d 467 (2000), in which the court held that, where gang evidence is to be integral to the defendant's trial, the trial court must ask potential jurors during *voir dire* about any biases they may have against gangs. The trial court dismissed the petition at the first stage as untimely. The appellate court reversed the dismissal and remanded the cause for second-stage proceedings. *People v. Sanders*, No. 1–02–0880 (2003) (unpublished order under Supreme Court Rule 23). On remand, the trial court found the petition was not untimely or barred by *res judicata*, based upon a 2002 appellate court decision, *People v. Gardner*, 331 Ill. App. 3d 358 (2002), which found *Strain* to be applicable on collateral review. Thus, the trial court denied the State's motion to dismiss on those grounds. The court advanced the petition to third-stage proceedings to determine whether the gang evidence at defendant's trial was integral to the trial within the meaning of *Strain*. The court reviewed transcripts from the trial and heard oral argument. The court granted the State's motion to dismiss on the basis that the gang evidence could not have been considered integral to the trial.

On appeal, the appellate court held that *Strain* announced a new rule and thus could not be applied retroactively to defendant's case. The court rejected defendant's reliance on *Gardner*, finding that, although *Strain* was doctrinally consistent with prior law, it represented a clear break in placing a "stringent limitation upon the broad range of discretion traditionally afforded to the trial court." 393 Ill. App. 3d at 166. The appellate court concluded that, because *Strain* was not applicable to defendant's case, his postconviction petition was barred by *res judicata*. In addition, the appellate court noted that, even if it agreed with the *Gardner* court's analysis, it would find that defendant's petition was barred as untimely. 393 Ill. App. 3d at 167.

ANALYSIS

Defendant raises three arguments in this appeal: (1) this court's decision in *Strain* did not announce a new constitutional rule of criminal procedure and therefore applies retroactively to defendant's case; (2) defendant's postconviction petition is not barred by *res judicata* and the late filing of his petition was not due to his culpable negligence; and (3) under the holding of *Strain*, the gang evidence was integral to defendant's trial and the trial court's failure to *voir dire* potential jurors on the issue of gang bias thus deprived him of a fair trial.

Defendant argues that this court's decision in *Strain* applies retroactively to his case.

A postconviction proceeding is a collateral attack on a prior conviction in which a defendant may challenge his conviction or sentence on the basis that his substantial constitutional rights were violated. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008). Postconviction claims are limited to those claims that were not and could not have been previously adjudicated on direct appeal. *People v. Johnson*, 206 Ill. 2d 348, 356 (2002). Claims that were raised and decided on direct appeal are barred by *res judicata* and those claims that could have been raised, but were not, are considered waived. *People v. Towns*, 182 Ill. 2d 491, 502-03 (1998). Here, the trial court advanced defendant's petition to third-stage proceedings. However, the court heard no new evidence; rather, the court reviewed the transcripts from the trial and heard arguments of counsel. In addition, the judge who presided over the postconviction hearing was not the same judge who presided at defendant's trial. Defendant argues, and the State does not disagree, that the judge had no special expertise or familiarity with defendant's trial. In such circumstances, this court has applied a *de novo* standard of review. See *People v. Caballero*, 206 Ill. 2d 65, 88 (2002). In addition, this court applies a *de novo* standard of review as to questions of law. *In re D.S.*, 198 Ill. 2d 309, 321 (2001).

In *Strain*, the defendant was charged with murder. The State's theory was that the defendant, who was a member of the Black Disciples street gang, shot the victim while attempting to take revenge on a rival gang, the Gangster Disciples, for allegedly shooting the defendant at an earlier time. During *voir dire*, the trial court asked potential jurors if they, any member of their family, or close friend had

been involved in a gang. The court refused defense counsel's request to ask each prospective juror whether the juror would find the defendant less believable if the juror learned that the defendant belonged to a gang. During trial, gang members testified, a statement made by defendant to the police concerning the gang-related motive for the shooting was admitted into evidence, and defendant testified, denying that he made the statement. The trial court allowed the State to introduce evidence at trial of other gang-related crimes in an effort to bolster the State's theory regarding the motive for the murder. The defendant was convicted. This court noted two matters of crucial importance: (1) gang information permeated the testimony of almost every witness at trial; and (2) the outcome of the trial turned upon the credibility of the defendant, the testifying police officers, and members of the Gangster Disciples. *Strain*, 194 Ill. 2d at 473.

This court noted that article I, section 13, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §13) guarantees a "right of trial by jury as heretofore enjoyed." The court had previously construed those words to mean the right to trial by jury as it existed under the common law, which entails the right to have the facts determined, under the supervision of a judge, by the unanimous verdict of 12 impartial jurors who possess the qualifications and are selected in the manner prescribed by law. The court observed that the scope and extent of the *voir dire* examination is left to the discretion of the trial court; however, that discretion must be exercised in a manner consistent with the purpose of *voir dire*, which is to obtain enough information about the beliefs and opinions of potential jurors as would allow for the removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed by the trial court. A failure to permit pertinent inquiries to reveal any such prejudices may constitute reversible error. *Strain*, 194 Ill. 2d at 476-77.

This court noted it had previously recognized that street gangs are regarded with disfavor by other segments of society and that, especially in metropolitan areas, there may be strong prejudice against gangs. For this reason, this court has held that evidence of gang membership or gang-related activity is admissible only where there is sufficient proof that such membership or activity is related to the crime charged. *Strain* stated that these same concerns dictated its

holding that "when testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, the defendant must be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court, concerning gang bias." *Strain*, 194 Ill. 2d at 477.

The question before us is whether *Strain* announced a new constitutional rule of criminal procedure. In *Teague v. Lane*, 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989), the United States Supreme Court set forth standards for determining when a case announces a new rule. The Court stated that a case announces a new rule when it breaks new ground or imposes a new obligation on the states or federal government. The result must not be "*dictated* by precedent existing at the time the defendant's conviction became final." (Emphasis in original.) *Teague*, 489 U. S. at 301, 103 L. Ed. 2d at 349, 109 S. Ct. at 1070. Generally, new rules are not to be applied retroactively to cases on collateral review except in two instances: (1) if the rule places certain kinds of primary, private individual conduct beyond the power of the criminal-law-making authority to proscribe; or (2) if the rule requires the observance of those procedures that are implicit in the concept of ordered liberty. The Court described rules that come within the second exception as "watershed rules of criminal procedure" and stated that they should be limited to those new procedures without which the likelihood of an accurate conviction is seriously diminished. *Teague*, 489 U.S. at 311, 313, 103 L. Ed. 2d at 356, 358, 109 S. Ct. at 1076, 1077.

The purpose of the *Teague* framework is to promote the government's interest in the finality of criminal convictions (*Teague*, 489 U.S. at 309, 103 L. Ed. 2d at 355, 109 S. Ct. at 1074) and to validate "reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions" (*Butler v. McKellar*, 494 U.S. 407, 414, 108 L. Ed. 2d 347, 356, 110 S. Ct. 1212, 1217 (1990)). " 'Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect.' " *People v. Flowers*, 138 Ill. 2d 218, 239 (1990), quoting *Teague*, 489 U.S. at 309, 103 L. Ed. 2d at 355, 109 S. Ct. at 1074.

It is "often difficult" to determine whether a case announces a new rule. *Teague*, 489 U.S. at 301, 103 L. Ed. 2d at 349, 109 S. Ct. at 1070. This is particularly true where the new decision is reached by an extension of the reasoning of prior cases. *Butler*, 494 U.S. at 412-13, 108 L. Ed. 2d at 355, 110 S. Ct. at 1216. "[T]he fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*." *Butler*, 494 U.S. at 415, 108 L. Ed. 2d at 356, 110 S. Ct. at 1217. Rather, the task is to determine whether courts considering the defendant's claim at the time his or her conviction became final "would have felt compelled by existing precedent to conclude that the rule *** was required by the Constitution." *Saffle v. Parks*, 494 U.S. 484, 488, 108 L. Ed. 2d 415, 424, 110 S. Ct. 1257, 1260 (1990); *People v. Morris*, 236 Ill. 2d 345, 360 (2010). This court adopted the *Teague* retroactivity standards in *Flowers*, which held that this court's decision in *People v. Reddick*, 123 Ill. 2d 184 (1988), constituted a new constitutional rule of criminal procedure and was not applicable to postconviction proceedings. *Flowers*, 138 Ill. 2d at 240.

Defendant argues that this court's holding in *Strain* derives from the constitutional principle that an accused has the right to an impartial jury. He notes this court has previously stated in *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993), that the purpose of *voir dire* is to ascertain sufficient information about the beliefs and attitudes of prospective jurors to allow removal of those venire members whose biases and prejudices would prevent them from applying the law as instructed by the trial court. Defendant argues that *Strain* applied this principle in light of the judicially recognized bias against gang affiliation. Defendant also points to prior cases in which he says this court and the appellate court recognized the potential for bias against gangs among prospective jurors. Thus, defendant argues that *Strain* was motivated by concerns regarding the prejudicial effect of gang evidence and it relied on prior case law in reaching its holding. For these reasons, *Strain* did not announce a new rule.

Defendant particularly emphasizes *Strain*'s statement, after citing cases that had recognized the prejudice against gangs, that "[t]he same concerns regarding the prejudicial effect of gang evidence *dictate* our

holding that, when testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial," the trial court must question potential jurors about any bias against gangs. (Emphasis added.) *Strain*, 194 Ill. 2d at 477.

Defendant notes that the appellate court in *People v. Gardner*, 331 Ill. App. 3d 358 (2002), held that *Strain* did not announce a new rule. *Gardner* found that *Strain* had premised its holding on prior case law concerning the purpose of *voir dire*, the procedures outlined in Rule 431 (177 Ill. 2d R. 431), and constitutional safeguards. *Gardner* also noted *Strain*'s citation of cases recognizing the possibility of strong prejudice against gangs in large metropolitan areas. *Gardner* found that *Strain* did not announce a new rule, given its reliance on precedent and long-standing principles surrounding *voir dire*. Thus, the *Gardner* court stated that the holding of *Strain* may be applied retroactively to cases on collateral review. *Gardner*, 331 Ill. App. 3d at 367.

The State argues that, although *Strain* may have been doctrinally consistent with the rules regulating *voir dire* and with case law regarding public disapproval of gang membership, *Strain* was the first time this court had mandated gang-bias inquiry during *voir dire* based upon, not just an abuse of discretion, but a denial of the constitutional right to an impartial jury. The State argues this conclusion did not necessarily follow from this court's rules or existing case law.

This court has long recognized that the scope and extent of *voir dire* examination rests within the discretion of the trial court. *People v. Lobb*, 17 Ill. 2d 287, 300 (1959); *People v. Buss*, 187 Ill. 2d 144, 176 (1999); *People v. Williams*, 164 Ill. 2d 1, 16 (1994). Although Rule 431 requires the trial court to allow counsel to "supplement the examination by such direct inquiry as the court deems proper for a reasonable period of time depending upon the length of the examination by the court, the complexity of the case, and the nature of the charges," this court has held that the trial court retains discretion to determine what direct questioning will be allowed, as long as the court exercises its discretion in accordance with the requirements of the rule. See *People v. Garstecki*, 234 Ill. 2d 430 (2009). Indeed, this court in *Garstecki* even noted that it was not impossible to conceive of a case in which the trial court might properly conclude, based upon the factors cited above, that no

attorney questioning should be permitted. *Garstecki*, 234 Ill. 2d at 444.

Defendant cites several cases that he believes support his contention that *Strain* did not announce a new rule. His reasoning is that these cases recognized the disfavor in which street gangs are held by the general public, directly leading, in his view, to this court's holding in *Strain*.

In *People v. Jimenez*, 284 Ill. App. 3d 908 (1996), the defendant was charged with murder. The shooting was gang-related and the State focused on gang affiliation as the motive for the murder. The defendant asked the trial court to question the individual members of the venire on whether the fact that the defendant was a member of a street gang would prevent them from giving him a fair trial. The trial court refused the question. On appeal, the defendant argued that the trial court committed reversible error by refusing to question the venire on the subject of gang affiliation. The appellate court reversed and remanded for a new trial. The court noted that the parties had cited no case requiring the trial court to question prospective jurors about biases against gang members. The court observed that in most Illinois cases, the trial court had permitted such questions to be asked. The court noted that gang membership is an area of potential bias due to a widespread prejudice against street gangs. Because the trial court failed to ask any questions concerning this bias, the defendant was deprived of the opportunity to exercise his peremptory challenges in an effective manner. Once the trial court decided to permit evidence of the defendant's gang affiliation, the trial court was under a "clear duty" to insure that the jury selected was free from prejudice against gangs. *Jimenez*, 284 Ill. App. 3d at 912. We note that *Jimenez* relied on a California case for this holding, noting that the question was one of first impression in Illinois. *Jimenez*, 284 Ill. App. 3d at 912.

In *People v. Pogue*, 312 Ill. App. 3d 719 (1999), the defendant was charged with shooting a member of a rival gang. The appellate court reversed and remanded for a new trial on the basis that the trial court had failed to question individual members of the venire concerning the defendant's right not to testify as required by *People v. Zehr*, 103 Ill. 2d 472 (1984). Because the issue was likely to recur on retrial, the appellate court also addressed the defendant's contention that the trial court erred by refusing to ask prospective

jurors whether the defendant's gang affiliation would affect their ability to be fair and impartial. Relying on *Jimenez*, the appellate court held that the trial court should have questioned the venire concerning gang bias. Specifically, the court noted that, while *Jimenez* does not impose an affirmative duty on the trial court to make gang bias inquiries *sua sponte*, "where an appropriate question is tendered prior to *voir dire*, and the circumstances of the case are such that fundamental fairness requires that the venire be probed on this issue, the refusal to do so constitutes reversible error." *Pogue*, 312 Ill. App. 3d at 727.

Defendant also cites *People v. Cruz*, 164 Ill. App. 3d 802 (1987). There, the trial court allowed the State to show the jury a documentary video concerning street gangs in an attempt to support its effort to establish a gang-related motive for the shooting. The victim claimed that he had been harassed by members of the defendant's gang to join the gang and that the shooting was part of an attempt to recruit him. The appellate court found the admission of the video to be highly inflammatory and prejudicial. The court noted that in Chicago there was a " 'deep, bitter and widespread prejudice against street gangs.' " *Cruz*, 164 Ill. App. 3d at 812, quoting *People v. Parrott*, 40 Ill. App. 3d 328, 331 (1976).

Defendant also cites *People v. Smith*, 141 Ill. 2d 40, 58 (1990), a capital case involving extensive evidence of gang-related activity. In discussing this evidence and its relevance, this court noted that it has been recognized that, particularly in metropolitan areas, there may be strong prejudice against street gangs.

We note that neither *Cruz* nor *Smith* involved any issue concerning *voir dire*. Regarding *Jimenez*, the appellate court in *Pogue* recognized that *Jimenez* imposed no *sua sponte* duty on the trial court to question the venire regarding gang bias. Rather, *Pogue* noted that the thrust of *Jimenez* was that where gang-bias questions are submitted and "fundamental fairness" so dictates, a trial court is required to question potential jurors on gang bias. *Pogue*, 312 Ill. App. 3d at 727. This amounts to no more than saying that a trial court abuses its discretion in refusing to question the venire concerning gang bias in appropriate cases. These cases cannot be said to lead inevitably to the holding of *Strain*.

This court has previously held that a new requirement mandating

-11-

certain questions during *voir dire* did not apply retroactively. In *Zehr*, this court held that it was error for the trial court to refuse to ask prospective jurors, upon the defendant's request, whether they understand and accept the following concepts: (1) the defendant is presumed innocent until proven guilty; (2) the defendant is not required to offer any evidence in his own behalf; (3) the defendant must be proved guilty beyond a reasonable doubt; and (4) the defendant's failure to testify in his own behalf cannot be held against him. *Zehr*, 103 Ill. 2d at 477. In *Zehr*, the State argued that because Supreme Court Rule 234 prohibited *voir dire* questions on matters of law or instructions, the trial court properly refused to ask the defendant's questions. This court rejected that argument, noting that the understanding of the four concepts was essential to the qualification of jurors in a criminal case. If a juror has an objection to any of these basic guarantees, the court opined, an instruction given at the end of the trial will have little curative effect. The court observed that each of the mandated inquiries goes to the heart of a particular bias or prejudice that would deprive a defendant of the right to a fair and impartial jury. The failure to ask such questions thus results in prejudicial error. *Zehr*, 103 Ill. 2d at 477-78.

Despite the importance of the questions mandated by *Zehr*, this court held in *People v. Britz*, 112 Ill. 2d 314, 318-19 (1986), a pre-*Teague* case, that the holding of *Zehr* was to be given only prospective effect because it represented a change in Illinois law. In support of this holding, the court cited Rule 234's prohibition of *voir dire* questions that directly or indirectly concern matters of law or instructions and noted that *Zehr* represented a departure from that rule. Defendant here attempts to distinguish *Britz* by noting that while *Zehr* was contrary to supreme court rules, *Strain* was in accord with those rules. This claim is inaccurate. As previously noted, the conduct of *voir dire* has historically been left to the trial court. *Strain* represented a break from this precedent by removing the trial court's discretion where gang evidence will be integral to a defendant's trial. Rule 431 was adopted by this court to regulate *voir dire* examination of prospective jurors. That rule gives the trial court the primary discretion of conducting *voir dire* and for determining the extent and scope thereof. *Strain*, 194 Ill. 2d at 475-76. The holding of *Strain*, removing that discretion when gang evidence is to be integral to the

trial, was not consistent with that rule.

In his argument that *Strain* did not announce a new rule, defendant relies heavily on *Strain*'s recognition of the disfavor in which gangs are held by the general public and its citation of prior cases that had commented on this fact. However, it does not necessarily follow from this that *Strain* was a mere extension of this prior precedent. And even if *Strain* is viewed as an extension of prior precedent, this fact alone would not be enough to find that *Strain* did not announce a new rule. As we noted earlier, "the fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*." *Butler*, 494 U.S. at 415, 108 L. Ed. 2d at 356, 110 S. Ct. at 1217. Rather, the key to the determination of whether a new rule was announced is whether courts considering the defendant's claim at the time his or her conviction became final "would have felt compelled by existing precedent to conclude that the rule *** was required by the Constitution." *Saffle v. Parks*, 494 U.S. 484, 488, 108 L. Ed. 2d 415, 424, 110 S. Ct. 1257, 1260 (1990); *People v. Morris*, 236 Ill. 2d at 360.

Defendant has cited no case predating *Strain* that came to the conclusion that mandated questioning of the venire was required by the Constitution. The case that comes closest to doing so, *Jimenez*, relied on a California case for its holding. *Jimenez*, 284 Ill. App. 3d at 912-13. The fact is that, prior to *Strain*, as the State notes, there were very few subjects concerning which trial courts were required to question potential jurors. Some of those subjects included the *Zehr* factors (*Zehr*, 103 Ill. 2d 472); views concerning the defense of insanity (*People v. Stack*, 112 Ill. 2d 301 (1986)); racial bias in certain cases (*People v. Hope*, 184 Ill. 2d 39 (1998)); abortion *(People v. Murawski*, 2 Ill. 2d 143 (1954)); dram shop and temperance (*Lavin v. People*, 69 Ill. 303 (1873); *Schneider v. Kirk*, 83 Ill. App. 2d 170 (1967)); and life-qualifying questions in capital cases (*People v. Buss*, 187 Ill. 2d 144 (1999)). Instead, as we have noted, the scope of *voir dire* was committed in the vast majority of cases to the sound discretion of the trial court. For these reasons, at the time defendant's conviction became final, no court would have felt compelled by existing precedent to conclude that the rule announced in *Strain* was

required by the Constitution. Thus, the conclusion is inescapable that *Strain* announced a new rule.

Defendant, however, analogizes *Strain* to this court's decision in *People v. Moore*, 177 Ill. 2d 421 (1997). There, the issue was whether the decision in *People v. Kilpatrick*, 167 Ill. 2d 439 (1995), applied retroactively to the defendant's case. *Kilpatrick* held that section 5–8–1(c) of the Unified Code of Corrections (Code) prohibits a trial court from imposing a longer sentence on reconsideration, even if the aggregate period of imprisonment remains the same. *Kilpatrick*, 167 Ill. 2d at 446-47. The defendant in *Moore* had been given consecutive sentences. The appellate court vacated the sentences as improper and remanded for resentencing. The trial court resentenced the defendant to concurrent terms of imprisonment that equaled the combined length of his prior consecutive sentences. The defendant filed a postconviction petition challenging the sentences. This court held that *Kilpatrick* did not announce a new rule and was therefore applicable to cases on collateral review. In doing so, the court noted that a case does not announce a new rule if " ' " 'it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law.' " [Citations.]' " *Moore*, 177 Ill. 2d at 431, quoting *Penry v. Lynaugh*, 492 U.S. 302, 314, 106 L. Ed. 2d 256, 274, 109 S. Ct. 2934, 2944 (1989). *Moore* concluded that a decision does not announce a new rule if it merely applies existing precedent to an analogous set of facts. *Moore*, 177 Ill. 2d at 431. The court noted that *Kilpatrick* had relied on the Supreme Court's decision in *North Carolina v. Pearce*, 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969), which stated that due process may prohibit a judge from imposing a more severe sentence where a defendant has been convicted after a retrial in the absence of objective evidence of identifiable misconduct occurring after the time of the original sentencing. Section 5–8–1 of the Code was consistent with *Pearce*. *Moore* noted that this court followed *Pearce* in *People v. Baze*, 43 Ill. 2d 298 (1969). *Moore* noted further that the legislature had incorporated the *Pearce* and *Baze* decisions into section 5–5–4 of the Code (applicable in *Moore*), which prohibits a more severe sentence from being imposed on resentencing unless it is based on a defendant's conduct occurring subsequent to the original sentencing. Thus, *Moore*

-14-

concluded that this had been the rule in Illinois for over 20 years. *Kilpatrick* merely applied this precedent to the facts of that case. As such, the rule enunciated in *Kilpatrick* was predicated on well-settled principles of law. *Moore*, 177 Ill. 2d at 432-33.

*Moore* is distinguishable from *Strain*. The holding of *Kilpatrick* was a mere extension of existing law. It was already well settled in Illinois that due process prohibited a judge from increasing a sentence upon resentencing unless justified by a defendant's conduct occurring after the original sentencing. In addition, the Illinois legislature had enacted section 5–5–4 of the Code, incorporating *Pearce* and *Baze*. *Kilpatrick* merely applied the then-existing precedent and statutory law to the set of facts in that case. *Strain*, on the other hand, was a clear break from precedent. Nothing in the case law foretold the holding in *Strain*. Comments made by the dissenting justices in *Strain* confirm this fact. Justice Heiple noted in his dissent that this court had consistently held that potential jurors may not be asked about anticipated responses to specific items of evidence. Calling *Strain*'s holding "revolutionary," he worried that the court was setting a troubling precedent which would result in future litigants requesting *voir dire* on any potential bias merely by showing that the evidence on a particular subject will play a major role in the trial and that segments of our society view the subject with considerable disfavor. He expressed concern that such mandated questioning of the venire would be counterproductive and might corrupt a jury by prematurely exposing potential jurors to evidence. *Strain*, 194 Ill. 2d at 483-84 (Heiple, J., dissenting, joined by Bilandic, J.).

Defendant, however, maintains that there is a difference between a new rule and a "change" in the law and that *Strain* represents the latter, thus allowing him to avoid the bar of *res judicata*. In making this argument, defendant relies primarily on *Moore* and *Kilpatrick*. Although he agrees that *Kilpatrick* applied existing precedent and statutory law to the facts of that case, he argues that it nonetheless changed the law, allowing for retroactive application. Defendant points to the fact that the trial court and the appellate court in *Kilpatrick* had rejected Kilpatrick's claim. Defendant also notes that, prior to this court's *Kilpatrick* decision, the appellate court in *People v. Todd*, 263 Ill. App. 3d 435 (1994), reached a contrary conclusion to that reached by this court in *Kilpatrick*. Defendant further asserts

that because no lower court would reach this contrary conclusion subsequent to this court's *Kilpatrick* decision, *Kilpatrick*'s "clarification of what the law required represented a change from the previous state of affairs."

We disagree with defendant's argument. This court in *Moore* stated that the appellate court's decision in *Todd* was not a reasonable application of existing precedent and that it conflicted with *Pearce* and with the plain language of sections 5–8–1 and 5–5–4 of the Code. *Moore*, 177 Ill. 2d at 435-36. Further, that post-*Kilpatrick* decisions of the appellate court would not reach the contrary position of *Todd* merely reflects the fact that *Kilpatrick*, as a decision of this court, is binding on all lower courts. See *People v. Artis*, 232 Ill. 2d 156, 164 (2009).

We therefore conclude that this court's decision in *Strain* announced a new constitutional rule of criminal procedure. Under *Teague*, a new rule may not be applied retroactively except in two limited circumstances: (1) if the new rule places certain kinds of primary, private individual conduct beyond the power of the criminal-law-making authority to proscribe; or (2) if the rule is a watershed rule of criminal procedure, requiring the observance of those procedures that are implicit in the concept of ordered liberty. *Teague*, 489 U.S. at 311, 313, 103 L. Ed. 2d at 356, 358, 109 S. Ct. at 1076, 1077. The first exception is obviously not applicable. As to the second exception, we note the Supreme Court stated in *Teague* that it should be limited to those new procedures without which the likelihood of an accurate conviction is seriously diminished. *Teague*, 489 U.S. at 313, 103 L. Ed. 2d at 358, 109 S. Ct. at 1077. At oral argument in this case, counsel for defendant candidly acknowledged that neither exception applies to *Strain* and we agree. Thus, the holding of *Strain* is not retroactive and does not apply to cases on collateral review.

Because *Strain* announced a new rule and is not to be applied retroactively to collateral proceedings, defendant's postconviction petition is barred by *res judicata*. A postconviction proceeding permits review of constitutional issues that were not and could not have been adjudicated on direct appeal. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455-56 (2002). Thus, issues that were decided on direct appeal are barred from consideration by the doctrine of *res judicata*. *People v. Towns*, 182 Ill. 2d 491, 502 (1998). Here, absent the

applicability of *Strain*, the claim raised by defendant in his postconviction petition is the same one raised and decided in his direct appeal. Thus, *res judicata* bars defendant's petition. Due to our disposition of this case, we need not address the remainder of defendant's arguments.

## CONCLUSION

For the reasons stated, we hold that this court's decision in *Strain* announced a new constitutional rule of criminal procedure and that neither of the *Teague* exceptions to nonretroactivity apply. Therefore, the holding of *Strain* does not apply retroactively to cases on collateral review. Defendant's postconviction petition is thus barred by *res judicata*. In addition, we overrule the appellate court's decision in *People v. Gardner*, 331 Ill. App. 3d 358 (2002), to the extent that case is inconsistent with our holding today.

The judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE FREEMAN, specially concurring:

In its opinion, the majority concludes that our prior decision in *People v. Strain*, 194 Ill. 2d 467 (2000), announced a new constitutional rule of criminal procedure and, therefore, may not be applied retroactively. Although I have no quarrel with the majority's holding on this issue, I believe my colleagues have erred by not first addressing a threshold, procedural question: whether Sanders' postconviction petition was timely filed. The appellate court, using an incorrect standard, determined that Sanders' petition was untimely. Normally, such a holding ends the case, as the Post-Conviction Hearing Act (Act) (725 ILCS 5/122–1 *et seq.* (West 2000)) forbids any proceedings filed beyond the time periods it sets forth. However, the appellate court nevertheless reached the merits of the substantive issue. In their opinion, my colleagues do not address this threshold procedural issue, analyzing only Sanders' substantive claim. By doing so, this court creates confusion for the bench and bar in several

respects: not only does the court call into question the proper analytical sequence used to review such claims, the court also leaves standing a published appellate court opinion that applies an incorrect standard to assess the timeliness of Sanders' petition. Because today's opinion leaves these matters unaddressed, I am compelled to write separately.

Section 122–1(c) of the Act (725 ILCS 5/122–1(c) (West 2000)) sets forth the specific time period within which a petitioner shall initiate a postconviction proceeding. At the time defendant filed his petition, the Act provided:

> "No proceedings under this Article shall be commenced more than 6 months after the denial of a petition for leave to appeal or the date for filing such a petition if none is filed or more than 45 days after the defendant files his or her brief in the appeal of the sentence before the Illinois Supreme Court (or more than 45 days after the deadline for the filing of the defendant's brief with the Illinois Supreme Court if no brief is filed) or 3 years from the date of conviction, whichever is sooner, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence."

Thus, the General Assembly has not only established a clear framework within the Act for assessing the timeliness of a postconviction petition, but also has specified the test to be used to excuse a petitioner's noncompliance with these requirements: a petition filed outside the delineated time period is considered untimely unless "the petitioner alleges facts showing that the delay was not due to his or her culpable negligence." 725 ILCS 5/122–1(c) (West 2000); see also *People v. Rissley*, 206 Ill. 2d 403, 420 (2003); *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002).

The appellate court, despite acknowledging that the clear language of section 122–1(c) mandates the use of the culpable negligence standard to assess the timeliness of Sanders' initial postconviction petition, instead applied the cause-and-prejudice standard set forth in *Pitsonbarger* which is used to determine the timeliness of *successive*

postconvicition petitions.[1] In applying this heightened standard, the appellate panel reasoned that where a "defendant seeks in the first instance to file an untimely postconviction petition because of a change in the law that occurred after the filing deadline had passed," this is "analogous to the situation in which a defendant has already filed an unsuccessful postconviction petition, but seeks to file a successive postconviction petition because of a change in the law that occurred after the rejection of his first petition." 393 Ill. App. 3d at 171-72. This reasoning is without support and in error.

As this is the first postconviction petition filed by Sanders, both the Act and our case law make it clear that challenges to timeliness must be evaluated under the culpable negligence standard and not the more stringent cause-and-prejudice test. The appellate court ignored the distinction between initial and successive postconviction petitions, which mandates that each type of petition be evaluated under different analytical frameworks. In addition, the appellate panel's holding runs counter not only to our long-held view that the Act in general must be " 'liberally construed to afford a convicted person an opportunity to present questions of deprivation of constitutional rights' " (*Rissley*, 206 Ill. 2d at 421, quoting *People v. Correa*, 108 Ill. 2d 541, 546 (1985)), but also that the specific exception contained in section 122–1(c) allowing a petitioner to file an otherwise-untimely petition operates as a " 'special "safety valve" ' in the Act." *Rissley*, 206 Ill. 2d at 420, quoting *People v. Bates*, 124 Ill. 2d 81, 88 (1988).

In light of the above, I cannot understand why my colleagues do not address this threshold issue and clarify that the appellate court used the wrong standard. The majority's silence on this issue is even more disturbing in light of the concession made by the State in its brief to this court that the appellate court's holding with respect to timeliness does "not find support in the Act," and that the applicable

---

[1]Section 122–1(f) was added to the Act in 2004, and codified the holding of *Pitsonbarger*. By its plain language, section 122–1(f) applies only to *successive* postconviction petitions, and provides that a successive petition may be filed only upon leave of court where "a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122–1(f) (West 2004).

timeliness standard in this appeal is one of culpable negligence. Further, during oral argument, several members of this court repeatedly questioned the parties concerning the timeliness issue and the manner in which it was handled by the appellate panel. Counsel for both the State and petitioner agreed that the culpable negligence standard applies in this case, and that the appellate court erred in employing the cause-and-prejudice test.

It is my view that when the correct standard is applied to Sanders' postconviction petition, the delay in filing was not due to his culpable negligence. This court has defined culpable negligence as " 'something greater than ordinary negligence' " and " 'akin to recklessness.' " *Rissley*, 206 Ill. 2d at 420, quoting *People v. Boclair*, 202 Ill. 2d 89, 108 (2002). Sanders had argued on direct appeal that the circuit court's *voir dire* was deficient and denied him his constitutional right to a fair and impartial jury by failing to question the jury regarding potential gang bias. See 393 Ill. App. 3d at 160. Because this argument was rejected on direct appeal, Sanders was barred by *res judicata* from re-raising it in a postconviction petition. *People v. Whitehead*, 169 Ill. 2d 355, 371 (1996). As my colleagues hold today, this court's decision in *Strain* announced a new constitutional rule of criminal procedure which impacted defendant's ability to once again raise this issue in postconviction proceedings. Thus, it was only after *Strain* was decided that Sanders was able to resurrect the issue of inadequate *voir dire* without being barred by *res judicata*.

Here, Sanders' petition for leave to appeal to this court with respect to his direct appeal was denied on April 2, 1997 (*People v. Sanders*, 172 Ill. 2d 563 (1997)), and the six-month statutory postconviction period following that date expired on October 2, 1997. Since he was sentenced on May 4, 1994, the three-year period following that date expired on May 4, 1997. Therefore, under the applicable version of section 122–1(c), Sanders' postconviction petition was due on May 4, 1997, the earlier of the two dates. We decided *Strain* on November 16, 2000, and Sanders filed the instant postconviction petition exactly one year later, on November 16, 2001. Under these facts, I conclude that Sanders' delay in filing was not due to his culpable negligence, as he reasonably pursued the *voir dire* issue again after the new rule in *Strain* was announced. I note that the Act does not specify an additional time period, after the expiration of the

normal filing period, during which a petitioner may be found culpably negligent in filing a postconviction petition based upon a change in the law. In addition, our case law has not squarely addressed this issue. We have, however, traditionally relied upon federal case law in interpreting and applying the Act. *People v. Hodges*, 234 Ill. 2d 1, 12 (2009). In *Dodd v. United States*, 545 U.S. 353, 357, 162 L. Ed. 2d 343, 349, 125 S. Ct. 2478, 2481-82 (2005), the Supreme Court held that 28 U.S.C. 2255, ¶6(3) establishes that a federal prisoner may file a motion to vacate, set aside or correct his sentence within one year from the date on which the right he asserts was newly recognized by the Court. Relying upon *Dodd*, there is no question that, at a minimum, Sanders' petition filed one year after *Strain* was decided was not untimely.

Accordingly, after having survived this threshold procedural inquiry, it only then becomes appropriate to examine the substantive issue of whether *Strain* applied retroactively to Sanders' case. As stated, I am in agreement with my colleagues' holding that *Strain* represents a new constitutional rule of criminal procedure that is not to be retroactively applied.

JUSTICE BURKE joins in this special concurrence.